**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REGINA W. DEJARNETTE,
Plaintiff-Appellant,

v.  No. 96-1897

CORNING INCORPORATED,
Defendant-Appellee.

REGINA W. DEJARNETTE,
Plaintiff-Appellee,

v.  No. 96-1937

CORNING INCORPORATED,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Danville.
Jackson L. Kiser, Senior District Judge.
(CA-94-34-D)

Argued: October 1, 1997

Decided: January 5, 1998

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
MAGILL, Senior Circuit Judge of the United States Court of Appeals
for the Eighth Circuit, sitting by designation.

_____

No. 96-1897 dismissed and No. 96-1937 reversed by published opin-
ion. Senior Judge Magill wrote the majority opinion, in which Judge
Niemeyer joined. Judge Murnaghan wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Barbara Rubin Hudson, Danville, Virginia, for Appellant. Scott F. Zimmerman, REED, SMITH, SHAW & MCCLAY, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:** Carole S. Katz, REED, SMITH, SHAW & MCCLAY, Pittsburgh, Pennsylvania, for Appellee.

_____

**OPINION**

MAGILL, Senior Circuit Judge:

Regina DeJarnette, a pregnant probationary employee of Corning Inc. (Corning), was discharged during her probationary period after Corning gave her several warnings and negative evaluations based on her poor performance. DeJarnette brought this action of pregnancy discrimination under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (1994), against Corning. Following a jury trial, the district court granted in part and denied in part Corning's motion for judgment as a matter of law (JAML). Both parties now appeal. Because we find insufficient evidence to support a jury verdict of pregnancy discrimination, we reverse the district court's denial in part of Corning's motion for JAML and we dismiss DeJarnette's appeal as moot.

I.

In November 1992 Corning offered to hire DeJarnette to inspect and package glassware in its Danville, Virginia, facility. On November 5, 1992, Kathy Schrock, a personnel assistant for Corning, met with DeJarnette and told her that an inspector-packer (IP) position was available, and that DeJarnette could have the job if she passed a physical examination and an investigation. DeJarnette understood that Schrock, rather than extending a firm offer of employment, was extending an offer of employment which was strictly conditional on DeJarnette's passing both the examination and the investigation.

During this meeting, and before completing either the physical or the investigation, DeJarnette told Schrock that DeJarnette was preg-

2

nant. Schrock, who also was pregnant, told DeJarnette that DeJarnette's pregnancy was "`[n]o problem.'" I J.A. at 180 (trial testimony of DeJarnette). Schrock also informed DeJarnette that "there was no need" to inform other Corning employees about the pregnancy, id. at 217, because it was irrelevant to the IP position. [1] Id. at 251 (trial testimony of Schrock). That same day, Schrock informed Barbara Bardo, the Danville facility's Equal Employment Opportunity officer and personnel supervisor, about DeJarnette's pregnancy.

After DeJarnette passed both the physical examination and the investigation, Corning called DeJarnette in to work as an IP. DeJarnette was specifically informed that she would be a probationary employee for sixty days, and DeJarnette was aware that she was required to pass this probationary period before she could become a regular employee.

Corning watches its probationary employees closely and holds them to higher standards than its regular employees. Corning evaluates its probationary employees on the basis of their overall job performance, including their attitude toward their job and their coworkers.

As a probationary IP, DeJarnette worked alongside a conveyor belt and inspected and packaged glassware traveling along the belt. DeJarnette's primary duties included ensuring that the conveyor belt did not clog, inspecting the glassware for defects, discarding defective glassware, and packaging acceptable glassware in boxes. When not busy inspecting and packaging glassware, DeJarnette was required to perform housekeeping duties such as making boxes, cleaning her work area, and cleaning her coworkers' work areas.

While employed as a probationary employee, DeJarnette was supervised and evaluated by Wayne Liggon. During DeJarnette's sixty-day probationary period, Liggon gave DeJarnette two negative evaluations.[2] In each evaluation, Liggon criticized DeJarnette's poor

_____

[1] Contrary to DeJarnette's assertions in her brief and during oral argument, the record does not reflect that Schrock specifically told DeJarnette not to tell anyone about her pregnancy.
[2] While the first evaluation was given before Liggon was aware that DeJarnette was pregnant, we will assume that Liggon knew about DeJarnette's pregnancy before the second evaluation.

3

attitude, her poor use of slack time, her lack of enthusiasm, and her poor inspecting and packing performance. The first evaluation also noted that DeJarnette had overstayed some of her breaks. While reviewing the evaluations with DeJarnette, Liggon specifically warned DeJarnette that he was unsure that she should be retained as an employee and that she needed to show dramatic improvement.

After these negative evaluations, Corning extended DeJarnette's probationary period an additional thirty days. In a letter informing DeJarnette about the extension, Liggon commented on DeJarnette's lack of enthusiasm, poor attitude, poor use of slack time, and poor inspecting and packaging performance, and warned her "that a dramatic improvement in her performance must occur or she [would] be terminated with the company." II J.A. at 625.

During the extended probationary period, Liggon evaluated DeJarnette on three separate occasions. These evaluations noted that DeJarnette's inspecting and packaging performance was improving. However, these evaluations continued to criticize DeJarnette's poor use of slack time, her poor housekeeping habits, and her lack of enthusiasm. These evaluations also explicitly warned DeJarnette that dramatic improvement in these areas was required.

Despite Liggon's consistent warnings and negative evaluations, DeJarnette failed to make the necessary improvement. Accordingly, Liggon, Bardo, and Judith Breznay, Corning's plant manager, decided to discharge DeJarnette near the end of the extended thirty-day probationary period.

While DeJarnette was employed as a probationary employee, forty of Corning's forty-three IPs were female. In addition, nine of the eleven IPs under Liggon's supervision were female. Furthermore, between 1989 and 1993, twelve of Corning's female employees took pregnancy-related leaves of absence, and each of these employees was reinstated.

After being discharged, DeJarnette filed a complaint with the Equal Employment Opportunity Commission (EEOC). The EEOC declined to act on DeJarnette's complaint, and provided DeJarnette with a right-to-sue letter.

4

DeJarnette then sued Corning, claiming that its decision to discharge her constituted discrimination because of her pregnancy. The suit first went to trial in March 1995. The first trial resulted in a hung jury and was declared a mistrial. The suit was tried a second time in October 1995. The second jury found discrimination and awarded DeJarnette $51,451.48 in past wages, $57,334.87 in future wages, $50,000.00 in compensatory damages, and $100,000.00 in punitive damages. Corning then filed a motion for JAML or, in the alternative, for a new trial or, in the alternative, for remittitur. The district court denied Corning's motion for JAML as to liability, reasoning that Liggon's evaluations were subjective and easily fabricated, and asserting that the jury could reasonably rely on DeJarnette's coworkers' testimony to refute Liggon's evaluations. However, the district court granted Corning's motion for JAML with respect to DeJarnette's awards of front pay, compensatory damages, and punitive damages. The district court also conditionally granted Corning's motion for a new trial with respect to front pay, compensatory damages, and punitive damages. DeJarnette now appeals the district court's grant of Corning's motion for JAML as to front pay, compensatory damages, and punitive damages, as well as the district court's conditional grant of a new trial on these issues. Corning cross-appeals the district court's refusal to grant Corning's motion for JAML as to liability.

II.

We review the district court's denial of JAML de novo and examine the evidence in the light most favorable to DeJarnette, the non-moving party. See Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994). A motion for JAML should be granted with respect to an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue . . . ." Fed. R. Civ. P. 50(a). Accordingly, this Court must determine whether "there is substantial evidence in the record to support the jury's findings." Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir. 1985). When determining whether substantial evidence exists supporting the jury's verdict, this Court

> may not weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment of the facts for that of the jury. That deference to the jury's findings is not, how-

5

ever, absolute: A mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws to establish causation must be reasonably probable.

Charleston Area Med. Ctr., Inc. v. Blue Cross and Blue Shield, 6 F.3d 243, 248 (4th Cir. 1993) (quotations and citations omitted).

"[A] claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." Boyd v. Harding Academy, 88 F.3d 410, 413 (6th Cir. 1996). In a Title VII discrimination case, the plaintiff bears "the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). In a pregnancy discrimination case, the plaintiff thus bears the ultimate burden of establishing that the defendant discriminated against her "because of" her pregnancy. See 42 U.S.C. §§ 2000e-2(a)(1) & (2) (1994). Because this appeal follows a trial on the merits, this Court only addresses the issue of whether the plaintiff established discrimination vel non. See Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.) (citing to United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)), cert. denied, 116 S. Ct. 380 (1995). Accordingly, we address only the factual inquiry of "whether `the defendant intentionally discriminated against the plaintiff.'" Id. (quoting Burdine, 450 U.S. at 253).

To defeat an employer's motion for JAML as to liability in a discrimination suit, the plaintiff must present substantial evidence to support as a reasonable probability, rather than as a mere possibility, that her employer discriminated against her because of a protected characteristic. See Lovelace v. Sherwin-Williams Co. , 681 F.2d 230, 243 (4th Cir. 1980). This standard

> simply bespeaks the special danger that in a matter so generally incapable of certain proof [a] jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of produc-

6

> ing rationally probative evidence--and the corresponding risk of nonproduction--is placed upon claimants and subjected to the ultimate jury control devices of directed verdict and judgment n. o. v.

Id. at 242. The controlling issue in this case, therefore, is whether DeJarnette presented sufficient evidence to support as a reasonable probability the jury's finding that Corning intentionally discriminated against her because of her pregnancy. Cf. Jiminez, 57 F.3d at 377-78. After reviewing the evidence in the light most favorable to DeJarnette, we conclude that DeJarnette did not meet this burden.

DeJarnette failed to identify any similarly situated employees who were treated differently. While she identified nonpregnant probationary employees who became permanent employees despite being slower than DeJarnette on the line, DeJarnette failed to demonstrate that any of these employees shared her poor attitude, lack of enthusiasm, and poor use of slack time. In addition, the evidence clearly established that from 1989 through 1993, twelve of Corning's female employees took pregnancy-related leaves of absence and each of these employees was reinstated.

To prove discrimination, DeJarnette relies only on Corning's knowledge of her pregnancy when she was hired and her contention that Corning's articulated nondiscriminatory reasons for discharge -- DeJarnette's poor attitude, poor use of slack time, and lack of enthusiasm--are false. Rather than suggesting discrimination, Corning's knowledge of DeJarnette's pregnancy while hiring her creates an inference that Corning's reasons for discharging DeJarnette are not pretextual. See Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991). "From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." Id. (quotations, citation, and alteration omitted). Both Schrock and Bardo knew that DeJarnette was pregnant before DeJarnette even started working for Corning, and Bardo was involved in the ultimate decision to discharge DeJarnette. In addition, Schrock's and Bardo's salaries were at least indirectly tied to Corning's ability to hire and retain employees from protected classes. Corning specifically charged Bardo, as its Equal Employment Opportunity officer, with the responsibility to "hire, retain, and promote

7

female, minority, . . . [and other] people of the protected classes." I J.A. at 276. While DeJarnette speculates that Schrock and Bardo, from the instant that DeJarnette was hired, plotted with other Corning employees to create a paper record and discharge DeJarnette, DeJarnette has presented no evidence to support this conspiracy theory as a reasonable probability.

DeJarnette also has failed to show as a reasonable probability that Corning's reasons for discharging her were pretextual. This Court has held that to establish that an employer's "proffered reason for the challenged action is pretext for discrimination, the plaintiff must prove `both that the reason was false, and that discrimination was the real reason' for the challenged conduct." Jiminez, 57 F.3d at 377-78 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). DeJarnette failed to satisfy either prong.

While reviewing the employer's articulated reasons for discharge and the plaintiff's refutation thereof, we must keep in mind that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." Id. at 377. Particularly, this Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997) (quotations and citations omitted). See also EEOC v. Clay Printing, Inc., 955 F.2d 936, 946 (4th Cir. 1992). Our sole concern is

> whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

Giannopoulos, 109 F.3d at 410-11.

In an attempt to show that Corning's nondiscriminatory reasons for her termination are pretextual, DeJarnette relies on her own opinion and her coworkers' opinions that DeJarnette was an average or good employee. She relies on Data Processing Sheets to show that her

8

inspecting and packaging performance was at least average. And, contrary to her own testimony, she contends that she was never adequately trained to be an IP.

With respect to the opinion testimony, we have repeatedly explained that "`[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996) (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)). Accordingly, the plaintiff's "perception of [her]self . . . is not relevant." Smith, 618 F.2d at 1067. Similarly, that plaintiff's coworkers "may have thought that [she] did a good job, or that [she] did not `deserve' [to be discharged], is close to irrelevant." Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991) (footnote omitted).

To the extent that the proffered opinion testimony has any relevance,[3] it fails to prove as a reasonable probability that Liggon's evaluations were either false or pretextual for discrimination. See Giannopoulos, 109 F.3d at 411 (employee must present evidence reasonably calling into question the honesty of his employer's belief; employee's mere demonstration that his employer's belief may be incorrect is not sufficient to prove discrimination). Particularly, and rather than suggesting Liggon fabricated his evaluations, DeJarnette's coworkers testified that they considered Liggon to be a fair and honest supervisor and that they had no reason to believe Liggon wanted to discharge DeJarnette because of her pregnancy. In addition, Liggon rendered his first evaluation before he was aware of DeJarnette's pregnancy, and his other evaluations were consistent with the first evaluation. There is nothing in the record to suggest as a reasonable probability either that Liggon's knowledge of DeJarnette's pregnancy affected his remaining evaluations in any manner, or that Liggon did not truly believe that DeJarnette demonstrated a poor attitude, lacked enthusiasm, and used her slack time poorly.

_____

**3** Our conclusion that DeJarnette's coworkers' opinion testimony is substantially irrelevant is buttressed by the coworkers' concessions, during trial, that they rarely observed DeJarnette and that they were unable to observe DeJarnette as often as Liggon observed her.

DeJarnette's remaining evidence of pretext fails to specifically refute the facts--Liggon's evaluations--which support Corning's nondiscriminatory reasons for discharging her. See Mills v. First Fed. Sav. & Loan Ass'n, 83 F.3d 833, 845 (7th Cir. 1996) (plaintiff must specifically refute facts which support the employer's proffered non-discriminatory reasons). Corning discharged DeJarnette because of her poor attitude, lack of enthusiasm, and poor use of slack time. Corning did not discharge DeJarnette because of any difficulties she may have had with the technical aspects of the IP job. While the Data Processing Sheets may show that DeJarnette's packing and inspecting performance was average, they do not refute Liggon's opinion that DeJarnette had a poor attitude, lacked enthusiasm, and made poor use of her slack time. Similarly, DeJarnette's contention that Corning did not adequately train her to inspect glass does not refute Liggon's observations of DeJarnette's poor attitude, lack of enthusiasm, and poor use of slack time.

It is clear that DeJarnette failed to introduce sufficient evidence to support, based on a reasonable probability, a finding that she was discharged because of her pregnancy. Because DeJarnette failed to make a submissible case of pregnancy discrimination, we conclude that the district court erred in denying Corning's motion for judgment as a matter of law as to liability. Accordingly, we will not address the issues raised in DeJarnette's appeal.

III.

For the foregoing reasons, we reverse the district court order denying judgment as a matter of law to Corning as to liability. Because DeJarnette failed to prove a violation of Title VII and Corning is not liable, we dismiss DeJarnette's appeal as moot.

>    No. 96-1897 - DISMISSED
>    No. 96-1937 - REVERSED

MURNAGHAN, Circuit Judge, dissenting:

I feel compelled to dissent on the majority's determination of no liability. That represents a reversal of the conclusion of the district

10

court based on the jury's finding. Yet a jury's verdict should be respected when reasonable. Since adequately supported by the evidence, the verdict here was reasonable.

The issue of credibility of the witnesses is not for us. See Abasiekong v. City of Shelby, 744 F.2d 1055, 1059 (4th Cir. 1984). DeJarnette, as the non-moving party, was entitled to the benefit of "every legitimate inference" in her favor. Duke v. Uniroyal, Inc., 928 F.2d 1413, 1419 (4th Cir.), cert. denied, 502 U.S. 963 (1991). That is especially true where determinations of motive and causation are critical. Taylor v. Home Ins. Co., 777 F.2d 849, 854 (4th Cir. 1985), cert. denied, 476 U.S. 1142 (1986). Here DeJarnette presented sufficient circumstantial evidence involving credibility of witnesses to necessitate submission to the jury.

Reliance sua sponte by the majority on Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991), for the proposition that hiring and firing by the same individual constitutes an inference of non-discrimination is not justified. Schrock did the hiring, Breznay the firing. Also, Corning's attempt to rely on DeJarnette's supposed poor attitude, lack of enthusiasm and poor use of slack time, the existence of which were questioned by fellow employees, is "always suspect" because it provides a convenient mask for discrimination. Barnett v. W.T. Grant Co., 518 F.2d 543, 550 (4th Cir. 1975). Such subjective evidence, particularly in the complete absence of objective evidence from the employer, was vague and intangible, which may have occasioned substantial disparagement by the jury. That is especially true in view of the uncontroverted evidence of DeJarnette's speed and accuracy as an inspector-packer.

Although DeJarnette's allegedly poor technical performance was pervasive in her job evaluations, that attempt to justify her termination was abandoned by the time the case was tried. Supervisors Bardo and Breznay both testified that technical performance was "never an issue." Corning in the end asserted only "the intangible things." See Hossaini v. Western Missouri Med. Ctr., 97 F.3d 1085, 1089 (8th Cir. 1996) ("[S]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.").

The majority's opinion does not address the fact that Corning's justifications changed over time, nor is any attempt made to explain why

11

such change could not support a reasonable finding of pretext. "[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . ." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

Corning's knowledge of DeJarnette's pregnancy existed at all relevant times, and Corning admitted that DeJarnette was more technically proficient than many of her co-workers. Hence there was enough to support the jury's verdict of liability.*

_____

*Given the majority's unwarranted decision to reverse the jury's finding of liability, it seems unnecessary to address other issues that may have been raised, though I do not disagree with the disallowance of back pay or of punitive damages.

12