Erin Turco PLOPLIS, Plaintiff,

v.

PANOS HOTEL GROUP, L.L.C., d/b/a
Panos Hotel Group and Hampton Inn
& Suites of Pineville, Defendant.

No. 1:01 CV 00592.

United States District Court,
M.D. North Carolina.

June 17, 2003.

Roman C. Pibl, Kluttz Reamer Blankenship Hayes & Randolph, LLP, Salisbury, NC, for Erin Turco Ploplis.

David Christopher Osborn, Robert Burns McNeill, Horack Talley Pharr & Lowndes, Charlotte, NC, for Panos Hotel Group, LLC.

David Christopher Osborn, Horack Talley Pharr & Lowndes, Charlotte, NC, for Hampton Inn & Suites of Pineville.

## *MEMORANDUM OPINION AND ORDER*

ELIASON, United States Magistrate Judge.

This case comes before the Court on defendant's motion for summary judgment. That motion has been fully briefed by the parties and is now ready for decision.

## Facts

The facts in this case are relatively undisputed and are as follows. Defendant provides hotel management services to a group of Hampton Inn and Hilton Garden Inns located in the vicinity of Charlotte, North Carolina. In 1996, plaintiff went to work for defendant as an Outside Sales Manager for the Hampton Inn in Concord, North Carolina. Over the years, she received good performance reviews and was promoted to General Manager of the Concord Hampton. While in that position, she was supervised by Aubie Cook and Sidney Wilson, both of whom worked in defendant's corporate office. Her duties included ensuring that the hotel ran smoothly, along with supervising housekeeping, the front desk, sales and marketing, and maintenance.

In June of 1999, plaintiff was reassigned to the Hampton Inn and Suites in Pineville, North Carolina, as an assistant manager to Todd Middleton. However, due to defendant's dissatisfaction with Middleton, this arrangement did not last long. The Pineville Hampton was undergoing a large reconstruction project and its revenue, occupancy, and quality assurance scores had greatly declined. While some of the decline was attributable to the construction, defendant still expected that the rooms and common areas of the hotel would be kept clean and orderly. Defendant felt that Middleton had been unable to accomplish this and that he was not managing his staff effectively. Accordingly, in August of 1999, defendant terminated Middleton and promoted plaintiff to General Manager of the Pineville Hampton. (Pl.'s Dep. at 67)

Greg Panos, defendant's president, testified in his deposition that he was dissatisfied with plaintiff's performance as General Manager of the Concord Hampton and that he disagreed with Cook and Wilson's decision to transfer her to Pineville and then promote her to the General Manager position there. Based partly on these decisions and partly on other issues, Panos went outside the company and hired Bill Spencer to make management changes. Spencer became plaintiff's supervisor in November or December of 1999, although Wilson also retained some supervisory duties during this time.

The parties' disagree on the quality of plaintiff's job performance while at the Pineville Hampton. Plaintiff points to the fact that in November of 1999, the Pineville Hampton won defendant's "Best of the Best" award based on a quality assurance survey conducted in October of that year. This was a Panos-implemented inspection program. She also points to Aubie Cook's assessment that plaintiff did a good job when she worked in Concord, North Carolina. Finally, plaintiff submits four letters which she maintains reflect on her job performance. Two are from customers who were pleased with their stay at the Pineville property in late November or early December of 1999. (However, one was sent because the customer apparently received a complimentary room after some sort of room assignment mistake.) The other two letters are responses from Greg Panos to those two customers. Panos' letters are general in nature, thanking the customers for the letters and saying that defendant was glad to have met their needs and achieved its service goals. One letter does state that defendant is very proud of plaintiff and her team.

Defendant paints a different picture. It points to the fact that the owners of the Hampton Inn gave the Pineville Hampton low quality assurance scores and rankings (based on customer surveys) for part of the third and fourth quarters of 1999 when plaintiff was the general manager. (Pl.'s Dep. at 101, 105, 164–169) Also in Decem-

ber of 1999, several significant events occurred. Greg Panos testified at his deposition that while attending a Christmas party at the Pineville Hampton, he was "accosted" by two members of the housekeeping staff who complained about plaintiff's management of the hotel. Then, a few days later, he visited the hotel and found the lobby was dirty and that the hotel was "in disarray." He was so displeased that he removed the "Best of the Best" sign from the lobby, telling those present that the award should not be displayed in a such a lobby. He then contacted Spencer and told Spencer that the property was not getting better and that Spencer needed to "do something." A week or so later, Spencer informed him that he had moved plaintiff to a sales position and made Wilson the manager of the Pineville Hampton. (Panos Dep. at 66–67)

In early January of 2000, Spencer moved Wilson (at his request) out of the corporate office and into the position of Area Manager over the Pineville Hampton and a Hilton Garden Inn which was going to be opened next door to it. He also wrote a memorandum entitled "Announcement of Company Restructuring," dated January 12, 2000, which stated that Wilson was the Area Manager of the Pineville hotels, while plaintiff was temporarily reassigned to sales for the Pineville Hampton.

From that point on, plaintiff attended sales meetings. However, she testified that Spencer implied that once the hotel next door was finished and Wilson was working there, she would again be the General Manager of the Pineville Hampton. Plaintiff further testified that Wilson had little to do with the Pineville Hampton because he was involved with work at another hotel and with opening the Hilton next door. For this reason, she continued to run the Pineville Hampton during January and February of 2000 much as she had before the January restructuring. Also, her salary was not reduced.

On January 7, 2000, plaintiff saw an obstetrician who confirmed that she was pregnant. She first told only Wilson and a friend who was the manager of another hotel. However, on January 27, 2000, she told Bill Spencer, made a general announcement at a General Manager's meeting, and then told Greg Panos following the meeting. She told other management on the following day. No one responded in any sort of negative fashion.

In mid to late February of 2000, Spencer informed plaintiff that the Pineville Hampton had lost or could lose some corporate accounts because of cleanliness and service problems with the hotel. (Spencer Aff.; Pl.'s Dep. at 105) These accounts would have been the General Manager's responsibility and would have reflected on plaintiff's performance in sales. (Pl.'s Dep. at 110, 112)

Soon after these problems, Spencer hired Jerry Anderson, who had 13 years of hotel management experience, to work as the General Manager of the Pineville Hampton. Immediately afterward, Wilson informed her that a new General Manager was coming that day, that Spencer had ordered him to demote plaintiff to Assistant General Manager of the Pineville Hampton, and that plaintiff's salary was being reduced by $7,000. (Pl.'s Dep. at 138–140) Spencer gave Wilson four reasons for plaintiff's demotion: (1) cleanliness problems at the Pineville Hampton, (2) customer service complaints from the Steritech account, (3) the loss of two major corporate accounts, and (4) the failure to have documented Weekly Staff Department Meetings. These four reasons were incorporated by Spencer into a memorandum on March 9, 2002. (Pl.'s Dep. at 151

& Ex. 6) The memorandum also included a fifth reason, plaintiff's failure, over a long period of time, to have a broken security monitor repaired. According to the memorandum, this reason had not been discussed with plaintiff at the time she was demoted.

Plaintiff resented being expected to teach Anderson the systems at the Pineville Hampton. (Pl.'s Dep. at 141). When she spoke to him on March 3, 2002, according to plaintiff, Anderson told her he wanted her on his team and wanted her support. She told him things were handled unprofessionally *and that she was pregnant.* (Pl.'s Dep. at 144) Anderson responded that perhaps she had gotten "lost in the shuffle" and was not ready to be a General Manager yet. (*Id.* at 145) With respect to plaintiff's bringing up the subject of her pregnancy, Anderson allegedly said that he had heard that and also something to the effect that, "You know, being a GM might not be what you want to be when you are pregnant." (*Id.* at 144) Plaintiff evidently interprets this responsive comment as one with discriminatory animus, as opposed to a sympathetic, supportive response to an irrelevant subject which she initiated herself. In any event, plaintiff admits that this was "just his comment" as opposed to someone else's in management. (*Id.* at 146) Anderson denies making the statement.

Plaintiff also complained about her demotion to Wilson and Joanie Kastl, defendant's Vice–President of Operations. Kastl explained that defendant did not blame her for the problems at the Pineville Hampton, but simply wanted to bring someone in to get things back on track. Kastl asserts that plaintiff's pregnancy was never a part of any discussions that she had with Spencer or Panos concerning who should manage the Pineville Hampton. (Kastl Aff. ¶¶ 11–14, 16) Spencer sim-

ilarly denies that plaintiff's pregnancy influenced his decision, saying that he based it on her inability to manage the hotel and her poor performance in the sales position. (Spencer Aff. ¶ 16)

Plaintiff stayed on as the Assistant General Manager at the Pineville Hampton for about two months. During that time, her working relationship with Anderson was unhappy for both parties, although their accounts of the reasons differ. In addition to her unhappiness over the demotion, one of the frustrations plaintiff expressed was that Anderson did not fire a worker who evidently came to work with rubella and could have exposed her fetus. (Pl.'s Dep. at 181–187) Plaintiff decided to resign because she was frustrated and did not need the stress. (Pl.'s Dep. at 186) On May 19, 2000, plaintiff met with Wilson and Kastl and tendered a letter of resignation. Kastl offered to allow plaintiff to transfer to an Assistant General Manager position at another property in a prime location. Plaintiff alleges (and Anderson denies) that Anderson told her this might be less stressful and better for plaintiff and her child. (Pl.'s Dep. at 182) She again interprets this comment to have a discriminatory animus.

Although initially interested in the new position, plaintiff considered the offer over the weekend and declined it. She states that when she finally resigned, Kastl asked her whether she intended to return to work after she had her baby and commented that plaintiff might not want to be a General Manager while pregnant and after having the baby. Plaintiff testified in her deposition that she did not know what Kastl was implying with that statement. (Pl.'s Dep. at 208) Kastl denies ever having made the comment.

Following her resignation, plaintiff did not look for a new job. After the birth of her child in August of 2000, she did look at

some job advertisements, but did not send out resumes or interview for any positions. She even turned down chances to work for the Comfort Inn in Salisbury and to work for Cook who had left defendant and was then working for another hotel near plaintiff's home.

Based on these facts, plaintiff has filed claims alleging that her demotion was due to her pregnancy and that she was constructively discharged from her job with defendant. As part of the damages she seeks, plaintiff requests back pay from the date of her resignation and punitive damages. Defendant seeks summary judgment on all of plaintiff's claims, contending that plaintiff has not submitted sufficient evidence to warrant a trial on her discrimination and constructive discharge claims. Defendant also requests summary judgment on her claims for punitive damages and back pay by arguing that its alleged conduct is not sufficient to support the punitive damages claim and that plaintiff's failure to mitigate her damages by seeking employment bars her claim for back pay.

### Summary Judgment Standards

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir. 1990). When opposing a properly supported motion for summary judgment, the party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. *Id.* "The summary judgment inquiry thus scrutinizes the

plaintiff's case to determine whether the plaintiff has proffered sufficient proof, *in the form of admissible evidence,* that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) (emphasis added). A mere scintilla of evidence will not suffice. Rather, there must be enough evidence for a jury to render a verdict in favor of the party making a claim. A few isolated facts are not sufficient. *Sibley v. Lutheran Hosp. of Maryland, Inc.,* 871 F.2d 479 (4th Cir.1989).

### Discriminatory Demotion

■ Plaintiff's primary claim in this lawsuit is that, due to her pregnancy, she was demoted from the position of General Manager of the Pineville Hampton to the position of Assistant General Manager, resulting in a $7,000 a year pay cut. Plaintiff's claim arises under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Disability Amendments of 1978, 42 U.S.C. § 2000e, *et seq.* These amendments placed pregnancy discrimination into the definition of discrimination due to sex, meaning that plaintiff's claim must be analyzed using the same methods as gender discrimination claims. *DeJarnette v. Corning Inc.,* 133 F.3d 293, 297 (4th Cir.1998). Accordingly, plaintiff must demonstrate that she was discriminated against "because of" her pregnancy. *Id.*

■ Plaintiff can meet this burden in either of two ways. She can establish discrimination through direct or indirect evidence or she can use the burden-shifting scheme set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the burden-shifting model, plaintiff must first establish a prima facie case. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993) (citing *McDonnell–Douglas* at 802,

93 S.Ct. at 1824.) To do this in the present case, plaintiff must show that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was performing her job at a level that met her employer's expectations, and (4) that her position remained open or was filled with a person outside the protected class. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir.1999). If plaintiff is able to do this, defendant must show that there was a valid reason for any actions it took regarding her. *Hicks*, 509 U.S. at 510, 113 S.Ct at 2742. Once such a reason is proffered, plaintiff then has to demonstrate that the apparently valid reason was actually a pretext for discrimination. *Id.*

Here, plaintiff has not argued that she can proceed based solely on direct and indirect evidence. Therefore, she turns to the *McDonnell Douglas* burden shifting scheme to prove her case. The parties agree that she can establish the first, second, and fourth elements of a prima facie case. However, defendant contends that she cannot succeed in establishing the third element of a prima facie case because she has not submitted sufficient evidence for a jury to find that she was meeting her employer's legitimate job expectations at the time she was demoted. Defendant further argues that even if plaintiff established a prima facie case of discrimination, it has given proper, nondiscriminatory reasons for plaintiff's demotion and she cannot show that these reasons are a pretext for discrimination.

■ In many discrimination cases, the key issue is whether the plaintiff was meeting her employer's legitimate job expectations. That is true in this case as well. To support her contentions, plaintiff states that "[p]rior to her demotion, [she] had only received promotions, pay raises, 'Best of the Best' awards and glowing job reviews." (Pl.'s Br. at 8) Unfortunately for plaintiff, the Fourth Circuit has for some time made it clear, and has just recently given a strong reminder, that such evidence submitted by a plaintiff must be both focused and probative. *See King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003). The reason for carefully screening a plaintiff's evidence and requiring a plaintiff to present substantial, rationally probative evidence arises because discrimination cases present a special danger. By virtue of their generally being incapable of being proven with some certainty, the factfinder may be tempted to resort to factors such as sympathy, in order to make the decision. *DeJarnette*, 133 F.3d at 298. Consequently, plaintiff must submit probative proof that she was meeting *her employer's* job expectations. Her own opinion, that of coworkers, or others do not constitute probative proof that plaintiff was meeting her employer's job expectations. *King*, 328 F.3d at 149–50.

■ In the instant case, plaintiff provides little, if any, evidence that she was meeting her employer's job expectations. First, as even plaintiff concedes, events in her employment which occurred prior to her being promoted to General Manager of the Pineville Hampton are not really relevant in this case. (Pl.'s Br. at 2) (stating that the only important time period for the Court to consider is August 1999 through March 2000).[1] The Court agrees and, therefore, this forecloses plaintiff's reliance on Aubie Cook's assessment that she did a good job while working in Concord to show

---

**1.** The evidence she presents of promotions, pay raises, and glowing reviews all describes events that occurred prior to the time she took over as General Manager of the Pineville Hampton, a time when defendant does not claim that she did not meet expectations. (Pl.'s Br. Exs. 5, 6, 11, 12)

plaintiff met her employer's job expectations while working in Pineville, North Carolina. Consequently, for her proof, plaintiff is left with her November 1999 "Best of the Best" award and the two positive customer letters she received around the same time. The two customer letters simply are irrelevant to the inquiry of whether plaintiff was meeting her *employer's* job expectations. *King*, 328 F.3d at 145. They are the customers' opinion on a limited subject matter that may or may not constitute the job responsibilities assigned by the employer to plaintiff. Nor are Greg Panos' responses relevant to show plaintiff was meeting her employer's job expectations. The response letters serve a public relations purpose, not an employee evaluation one. Mr. Panos' statement in one letter that he is "very proud of Erin and her team" falls in this category and constitutes slight, if any, evidence that plaintiff was meeting all of her employer's job expectations. When a customer is happy with an employee's efforts, it serves no good purpose to write a critical letter.

The Best of the Best award may constitute some evidence that plaintiff was, at one point in time, meeting part of her employer's job expectations. However, it is not sufficient for a plaintiff to only offer proof that she was meeting part of her employer's job expectations part of the time. *DeJarnette*, 133 F.3d at 299. She must meet all or substantially all of those expectations. The Best of the Best award for the month of November does not satisfy this standard.

Plaintiff ignores the fact that she was criticized and warned of problems that needed to be corrected during the latter part of her tenure. The Best of the Best award received in November of 1999 was removed from the lobby a month later by Greg Panos, due to the return of dirty conditions at the Pineville Hampton. Plaintiff was almost immediately moved to a sales position on Panos' orders. Then, shortly before her demotion to Assistant General Manager, the hotel lost major accounts. These were negative events that she admits would have been the responsibility of both the sales person and the General Manager.

Plaintiff attempts to excuse the problems at Pineville by giving reasons for them. She cites the ongoing construction and changes in housekeeping staff as reasons for any cleanliness problems. She also contends that these problems contributed to the loss of the corporate accounts in February and that the problems had existed before she arrived at the property. Finally, she states that her performance at her sales job was affected by the fact that she was still engaging in many of her General Manager duties, a situation caused by Wilson's frequent absence from the Pineville Hampton.

■ Explanations and excuses for not meeting an employer's job expectations cannot serve to show plaintiff met her employer's job expectations. *King*, 328 F.3d 145. Nor does plaintiff supply probative evidence by showing the employer's standards were unreasonable. The Court cannot presume to know how to run a business and may not require businesses to use only such personnel policies which the Court deems to be fair and reasonable. *DeJarnette*, 133 F.3d at 298–299. The wisdom of this rule becomes clear in this case. Plaintiff's predecessor, Mr. Middleton, was subjected to the same "unreasonable standards" in conjunction with the ongoing construction and was fired. Plaintiff owed her job as General Manager in Pineville to this application of the "unreasonable standards." It will not do for plaintiff to now complain when those standards were applied to her, particularly when she was

only demoted with a $7,000 loss in salary and not fired. An employer need not lower its employment standards in order to give persons in a protected class special rights and exemptions that others do not receive.

To summarize, plaintiff fails to offer sufficient probative evidence that she was meeting her employer's job expectations. The fact that one time in November 1999 she may have met part of her employer's job expectations does not satisfy her burden. Excuses for not meeting the employer's job expectations, likewise, cannot serve to satisfy her burden.

█ Because plaintiff has failed to establish a prima facie case under the *McDonnell Douglas* burden shifting framework, that ends the matter, and defendant was not under any duty to proffer reasons for the adverse employment action. *King,* 328 F.3d at 150. But even if the Court were to assume that plaintiff had established her prima facie case, she still could not prevail. Defendant has given legitimate reasons for plaintiff's demotion, based mainly on cleanliness issues and the loss of corporate accounts. To defeat these reasons, plaintiff must show they are a pretext by demonstrating them to be false and the real reason to be discrimination. *DeJarnette,* 133 F.3d at 298. Plaintiff initially relies on the same evidence she did to establish her prima facie case, but this evidence is not sufficient for the reasons set out above. She also makes two additional arguments.

First, plaintiff alleges that defendant has changed its story concerning when her demotion occurred. She claims that defendant informed the Equal Employment Opportunity Commission (EEOC) that the demotion occurred in January of 2000, at the time she was moved to sales, rather than in March when she was moved to the Assistant General Manager position. This

is not quite accurate. What defendant actually told the EEOC is that plaintiff was moved from General Manager to a sales position in January of 2000, then to Assistant General Manager in March of that year. (Pl.'s Dep. Ex. 9) This is entirely consistent with the evidence in this case, and particularly with Spencer's Corporate Restructuring memorandum dated January 12, 2000 which describes Wilson as the manager of the Pineville Hampton and plaintiff as moving to sales. Plaintiff also points to the fact that she was a recipient of a memorandum, dated February 16, 2000, which announced a General Manager's meeting. She believes that this indicates that she was still a General Manager as of this date. Plaintiff is on the list of people receiving the memorandum, but so are Kastl and Peggy Lane, two persons described in the record as holding positions other than General Manager. Also, the fact that plaintiff may have been invited to attend such a meeting is fully explained by her testimony that she continued to perform many of the General Manager functions at the Pineville Hampton, even after her move to sales. Plaintiff's evidence does not show defendant changed its basic story concerning the events surrounding her demotion.

█ Second, plaintiff attempts to show pretext by relying on the alleged statements made by Anderson and Kastl concerning whether an Assistant General Manager's position might be less stressful for plaintiff or better for her and her child. There are two problems with this reliance. First, assuming the comments were made, they were innocuous, not discriminatory. In the context described by plaintiff, they were clearly attempts by co-workers to have plaintiff accept an awkward and difficult situation caused by reasons having nothing to do with her pregnancy. None of the statements imply, much less state

directly, that plaintiff could not do the General Manager's job because of her pregnancy or that she was demoted due to her pregnancy. They merely expressed sympathy and encouraged her to look at the bright side of her situation because at least her job would be less stressful. Stress was a factor which plaintiff herself gave as one reason for her resignation.[2] Such comments may not now be twisted to prove discriminatory intent. More to the point, none of the statements were made by Greg Panos or Bill Spencer, the persons who made the decision to demote plaintiff. *King,* 328 F.3d at 153. Plaintiff has produced no evidence showing that Anderson or Kastl's thinking was shared by the persons who demoted her. Thus, plaintiff has no evidence which would support a finding that defendant's proffered reasons for demoting plaintiff were a pretext for discrimination.

### Constructive Discharge

 Plaintiff's claim for constructive discharge can be easily decided. To recover for a constructive discharge through discrimination, plaintiff must show that defendant "deliberately made her working conditions intolerable in an effort to induce [her] to quit." *Taylor v. Virginia Union University,* 193 F.3d 219, 237–238 (4th Cir. 1999), *cert. denied,* 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000), *quoting, Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1353–54 (4th Cir.1995). Actions are "deliberate" only if they were intended to force plaintiff to resign. *Id.* Whether a plaintiff was forced to quit is determined using the objective standard of whether a reasonable person in plaintiff's position would have felt compelled to resign. *Id.*

Although at a number of points in her response plaintiff states she was constructively discharged, she does not explicitly address defendant's arguments as to this claim. Even if plaintiff were not deemed to have abandoned her constructive discharge claim, summary judgment is still appropriate. Not only does she not offer any evidence that defendant intentionally made her work conditions intolerable so as to cause her to resign, she explicitly denied the assertion at her deposition. (Pl.'s Dep. at 185) Further, when plaintiff first attempted to resign, defendant offered her a different and more desirable position in order to get her to stay. For these reasons, defendant's motion for summary judgment will be granted as to this issue.

### Punitive Damages and Back Pay

Plaintiff has not responded to defendant's arguments on the issues of punitive damages and back pay. Therefore, she has abandoned them. Further, the dismissal of her discrimination and constructive discharge claims renders the punitive damages and back pay issues moot. No further discussion is needed on these matters.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (docket no. 17) be, and the same hereby is, granted and that this action is dismissed in its entirety.

### JUDGMENT

For the reasons set out in an Order filed contemporaneously with this Judgment,

---

**2.** Discrimination laws ill serve their purpose if they result in workers fearing to make any personal comments for fear of misinterpretation; especially in the situation where, as here, plaintiff encouraged recognition of her condition. Plaintiff enjoyed the special attention she received from coworkers because of her pregnancy. (Pl.'s Dep. at 184) When complaining to Anderson about her demotion, she was the one to interject her pregnancy for no apparent reason. (Pl.'s Dep. at 144) Nothing in Anderson's or Kastl's alleged comments suggests a disapproval of plaintiff because of her pregnancy.

**IT IS ORDERED AND ADJUDGED**
that defendant's motion for summary judgment (docket no. 17) be, and the same
hereby is, granted and that this action is
dismissed in its entirety.