**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2063

TIFFANYE WESLEY,

Plaintiff - Appellant,

v.

ARLINGTON COUNTY,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Claude M. Hilton, Senior
District Judge. (1:08-cv-00007-CMH-JFA)

Argued: September 22, 2009          Decided: December 7, 2009

Before WILKINSON and MICHAEL, Circuit Judges, and Irene M.
KEELEY, United States District Judge for the Northern District
of West Virginia, sitting by designation.

Reversed and remanded by unpublished per curiam opinion. Judge
Wilkinson wrote a separate dissenting opinion.

John R. Ates, ATES LAW FIRM, PC, Alexandria, Virginia, for
Appellant. Louise Marie DiMatteo, COUNTY ATTORNEY'S OFFICE,
Arlington, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Tiffanye Wesley ("Wesley"), who is an African-American female, began her career as a firefighter with the Arlington County Fire Department ("Department") in 1994. After several years' experience riding a fire truck, serving as a training center instructor and in other administrative roles, Wesley began the process of competing within the Department for the position of Captain. Although she met all of the minimum objective criteria to be eligible for promotion, and had twice passed both a written test and an experiential assessment designed to simulate the challenges faced by a Captain, the Department Fire Chief did not promote her.

Following denial of these promotions, Wesley filed an internal grievance, a complaint with the Equal Employment Opportunity Commission ("EEOC"), and, ultimately, this action, claiming that the Department had denied her the promotions based on race and gender in violation of Title VII of the Civil Rights Act.

The district court granted the Department's motion for summary judgment, holding that Wesley had not produced sufficient evidence under the first prong of the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to support a prima facie case of discrimination because she could not show that she was objectively qualified for the

2

position of Captain. In the alternative, it analyzed the second and third prongs of the McDonnell Douglas framework and concluded that, even if Wesley were qualified, the Department had met its burden of producing a non-discriminatory justification for not promoting her, and Wesley had not shown that justification to be pretextual.[1]

Wesley urges this Court to overturn the district court's award of summary judgment to the Department. Because we find that Wesley was qualified for the position of Captain, and produced evidence sufficient to support a jury finding that the Department's proffered reasons for non-promotion were mere pretext, we reverse the district court's grant of summary judgment and remand the case for trial.

## I.

Wesley's work experience includes periods within several units of the Department. For most of the first five years of her career, beginning in 1994, Wesley worked in "operations."[2] The

---

[1] On appeal, the parties do not dispute that the Fire Department met its burden of producing a non-discriminatory reason for its decision not to promote, as required under the second phase of the McDonnell Douglas burden-shifting regime. We agree.

[2] Wesley was out of operations for approximately seven months on maternity leave and subsequent light duty.

Department defines operations positions as those on fire trucks, ambulances, and other front-line assignments. Wesley gained her operations experience on the crew of a fire truck.

In 2000, Wesley asked for and received an instructor assignment at the Department's training academy. Over the following six years, she spent 20 months at the academy, 46 months in other administrative positions (including community relations and building inspection), and 27 additional months in operations. She is currently a Deputy Fire Marshal with the Department. [3]

The Department has established a three-stage process for promotion purposes. First, applicants who meet the minimum qualifications in terms of years of experience and education may take a written examination. The top scorers on this exam then attend an assessment center that tests practical skills. From the results of the assessment center, the human resources office prepares and certifies a list of "qualified" individuals and forwards it to the Fire Chief for final promotion decisions.

---

[3] The Department initially denied Wesley promotion to this post as well. After she raised the issue in her EEOC complaint, however, the Department promoted Wesley to the position; thus the initial denial is not at issue in this case.

After receiving this certified list of candidates eligible for promotion, the Fire Chief convenes what is known as a roundtable. The roundtable is a discussion among senior Department personnel about the strengths and weaknesses of each candidate. Finally, the Fire Chief chooses the candidates who will be promoted.

After Wesley received high scores on the written exam and at the assessment center, she twice successfully secured a place on the certified list for the position of Captain. As a result, she was eligible for promotion essentially any time between 2001 and 2005. She was never promoted to Captain, however. According to deposition testimony and affidavits of the Fire Chief and other senior personnel, the Fire Chief decided not to promote Wesley because participants at the roundtables voiced concerns about her job abilities, experience and performance. Wesley has produced competing accounts of the conversations and disputes that these concerns were raised.

Either before or during the roundtables, reviewing officers received a promotional sheet for each candidate on which they could note an applicant's strengths and weaknesses. Unfortunately, no completed promotional sheets pertaining to Wesley are available for review as the Department destroyed them, an act Wesley contends violated Title VII and EEOC record-

5

retention regulations.[4] See 42 U.S.C. § 2000e-8(c), 29 C.F.R. § 1602.31.6.

## II.

We review the district court's grant of summary judgment de novo. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004). In doing so, we must construe the evidence and any inferences in the light most favorable to Wesley, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III.

The district court granted summary judgment to the Department on two grounds. First, it held that Wesley had failed to prove a prima facie case of discrimination; alternatively, it found that she had failed to rebut the Department's proffered

---

[4] Wesley argues that the promotional sheets were "personnel or employment record[s] made or kept by a political jurisdiction," which must be retained for two years and during the pendency of any charge of discrimination. 29 C.F.R. § 1602.31. We need not find that a violation of the recordkeeping law occurred to reach our decision in this case. However, the Department offers no argument against such a finding beyond claiming that Wesley did not raise the issue in the district court and thus waived it on appeal. Wesley notes that she raised the issue in her memorandum opposing summary judgment.

non-discriminatory reasons for not promoting her. We address each finding in turn.

A.

The district court found that Wesley failed to produce and forecast sufficient evidence to prove she was qualified for the position of Captain. Following a review of the record in the light most favorable to Wesley, we conclude otherwise.

> Under the McDonnell Douglas framework, [a plaintiff] can establish a prima facie case by showing that (1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination.

Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005). Only the third requirement, qualification, is at issue in this case. As an African-American female, Wesley is a member of a protected group, and she applied for promotion to Captain through the proper Department procedures. Previously, we have held that the fourth element, "an inference of unlawful discrimination," is satisfied where a position is filled by an applicant outside the protected class. Carter v. Ball, 33 F.3d 450, 455 (4th Cir. 1994). In this case, several white male firefighters were promoted to Captain instead of Wesley.

The Supreme Court has characterized a plaintiff's initial burden in a Title VII case under McDonnell Douglas as "not onerous." Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248

7

(1981). Accordingly, we have described the threshold as "relatively modest," Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 545 (4th Cir. 2003)(internal quotations and citations omitted), and as a "relatively easy test" that may be satisfied even when there is "no clear-cut indication that race played a part in choosing the successful applicant." Young v. Lehman, 748 F.2d 194, 197 (4th Cir. 1984).

Wesley urges this Court to adopt a bright-line rule preventing employers from using subjective qualifications in establishing the requirements of a job. Several of our sister circuits agree with this limitation. See, e.g., Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005); Johnson v. Louisiana, 351 F.3d 616, 622 (5th Cir. 2003); Wexler v. White's Fine Furniture, 317 F.3d 564, 575 (6th Cir. 2003)(en banc); Jayasinghe v. Bethlehem Steel Corp., 760 F.2d 132, 135 (7th Cir. 1985); Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 342 (10th Cir. 1982); Lynn v. Regents of U. of Cal., 656 F.2d 1337 (9th Cir. 1981).

In contrast, the Third Circuit, in Fowle v. C & C Cola, 868 F.2d 59 (3d Cir. 1989), has held that a bright-line test is undesirable and that, in certain contexts, "there could be situations where subjective qualifications could be considered as part of the prima facie case." Id. at 64.

8

We need not decide this question here. Even under the more flexible holding of Fowle, subjective evidence is appropriate only in exceptional cases, such as where no objective facts are available or appropriate. Id. Here, there is sufficient objective evidence in the record to analyze Wesley's qualifications for the position of Captain.

By all accounts, Wesley met the minimum objective criteria to be eligible for promotion to the rank of Captain. She was eligible to take, and passed, the written test and assessment center in 2001 and 2003. As a result, the Department rated her "more than qualified" and put her on the certified lists from which the Fire Chief could select applicants for promotion.

Wesley contends that these factors deem her qualified for the purpose of establishing her prima facie case. The Department, on the other hand, considers these factors merely a preliminary step, and argues that, to be truly qualified, an applicant had to demonstrate several other qualities. In support of its argument, the Department points out that the position description for Captain set forth several qualifications beyond the testing hurdles Wesley successfully passed. These included "considerable experience in the fire department," "considerable knowledge" of Department practices, "[i]nterpersonal skills," and "[p]roblem solving skill[s]."

Some of these factors are at least partially duplicative of the threshold requirements for taking the Captain's exam. "Considerable experience," for example, is reflected in the minimum years of service required to sit for the test, while "considerable knowledge" and "problem solving skills" are indicated by an applicant's success on the written and assessment center portions of the promotional process. "Interpersonal skills" is a vague and subjective criterion, perhaps best measured by an applicant's standing in the eyes of her peers, supervisors and subordinates; the record includes multiple instances of Wesley's superiors praising her interactions with both coworkers and the public.

In addition to her success in the testing stages, Wesley gained generally positive performance reviews.[5] She also served as an acting captain on numerous occasions, apparently without incident, thus demonstrating she could in fact perform the duties required of the position.

---

[5] The record indicates that Wesley had a series of minor vehicle accidents, including one in 2002 resulting in a disciplinary letter and the loss of eight hours of vacation time. Yet the Department can hardly argue that such reprimands disqualify a firefighter from promotion: in 2002, the Department promoted an employee to Captain who had been suspended for forty-five days, barred from ever applying for promotion to other firefighter positions, and told that his actions at an accident scene endangered a patient's life.

Wesley's applications failed only at the roundtable stage. Although the Fire Chief and other Department personnel claim that decisions at that point were made on various objective and subjective factors related to Wesley's job performance and qualifications, it appears the Fire Chief's decision at this point was entirely discretionary. Under the Department's theory of qualification, only those persons actually selected by the Fire Chief would appear to be qualified applicants. Such a rule would forestall nearly any plaintiff from meeting her initial burden under the McDonnell Douglas burden-shifting regime.

The Department's evidence on this issue consists largely of the deposition testimony of the Fire Chief and other management personnel regarding Wesley's experience and job performance. The Chief and his subordinates repeatedly allege that concerns were raised, primarily at the roundtable stage, about Wesley's performance at the training academy and the relatively minimal time she had spent in operations positions. Unfortunately, because the Department failed to preserve the records of the roundtable discussions, little documentation of these alleged conversations survives.

Nevertheless, Wesley has proven her prima facie case even if we consider the affidavits and deposition testimony related to the roundtable discussions. At this stage, she need not establish that she was the most qualified person for the

11

position, only that she met the job requirements and thus was qualified for the position of Captain. Her written reviews from her time as a trainer and her other documented evaluations were positive. The affidavits and deposition testimony of the Fire Chief and other personnel related to the roundtable discussions are only evidence that management had concerns about her skills and performance. These issues are relevant at later stages of the analysis, but not to whether she actually possessed the requisite qualifications.

Therefore, we hold that Wesley's positive performance reviews, her documented achievements as a firefighter, and her success on the objective phases of the promotional process are sufficient to establish that she was qualified for the position of Captain.[6]

B.

After determining that Wesley was unqualified for the position of Captain, the district court alternatively analyzed the two remaining prongs of the McDonnell Douglas burden-shifting framework and concluded that Wesley could not show that the Department's non-discriminatory reasons were mere pretext.

---

[6] We do not understand the dissent to disagree with the conclusion that Wesley met this initial burden of showing that she was objectively qualified.

> [T]he plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)(quoting Burdine, 450 U.S. at 253).

The Department offers two main justifications for the Fire Chief's failure to promote Wesley: she lacked the experience and capabilities of many other candidates who were promoted; and the Fire Chief's senior officers informed him of problems with Wesley's performance. Although these justifications are sufficiently plausible on their face to meet the Department's burden under McDonnell Douglas, we are persuaded that Wesley has raised genuine questions of material fact about whether they are mere pretext for discrimination.

1.

While the Department did establish that Wesley had relatively few total years in operations when compared to some other applicants, a current Department senior officer testified that a firefighter's actual field experience could vary depending on what job within operations she held, and that Wesley had at least as much real firefighting experience as did white males promoted by the Fire Chief. Wesley also has established that the training academy position she held, which

13

the Department now discounts as non-operations experience, was a traditional stepping-stone to Captain.[7]

As evidence that its concern about Wesley's limited field experience was addressed before the litigation, the Department points to communications attempting to convince Wesley to leave the teaching position for operations. Yet it was entirely reasonable for Wesley to remain in the training academy for two reasons. First, as noted above, she had seen many employees use the training academy post as a finishing school for promotion to Captain. Second, the request to remove Wesley from the training academy came only a few weeks before she was to begin working with a new class of recruits. Her supervisor at the academy strongly opposed her removal. Furthermore, after she completed the course, Wesley did in fact return to an operations position.

The Fire Chief makes much of certain qualifications and certifications held by various applicants for the Captain position. Specifically, he asserts that he highly valued Advanced Life Support ("ALS") certification when making promotion decisions. He also cites Hazardous Materials ("hazmat") and technical rescue certifications. Wesley had none

---

[7] During the relevant time period, at least seven male firefighters were promoted to Captain after serving at the training academy. All applicants with instructor experience were promoted in 2003 except Wesley, another female applicant and a male who had been cited for driving under the influence.

14

of these certifications. Yet participants of the roundtables dispute whether the Fire Chief ever discussed these certifications during these sessions, and whether they constituted a major factor in promotional decisions. J.A. at 228. Notably, the department failed to promote not only Wesley, but also the other two women on the 2003 qualified list, even though they both held the ALS certification. Especially where the Department has destroyed any records of these conversations, it was improper for the district court on summary judgment to credit the affidavits and testimony of some participants (namely the Fire Chief) over other contradictory accounts.

Furthermore, if the Fire Chief's version of his decision is to be believed, he valued every certification or qualification that Wesley did not have, and discounted any factor on which she might have been viewed favorably. The Department highlights that one applicant had experience running his own business, and that another had worked on an inter-jurisdictional task force. Yet the Fire Chief allegedly gave no or little weight to leadership training, public relations roles, or acting captain experience, all of which Wesley possessed. Importantly, not every Captain within the Department is assigned to drive a fire truck or an ambulance. The job description in the position announcement lists "supervisory, administrative and technical work in the Fire Department." Indeed, the recruiting position that Wesley

15

held, and which the Department now criticizes as non-operational experience, was elevated to a Captain-level post after Wesley moved on to other assignments.

The purported importance of some marginally relevant qualifications and disregard of other, seemingly pertinent aspects of Wesley's career raise a genuine question of material fact as to whether the overall set of criteria now set forth is an accurate picture of the decisional framework in place at the time. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, *so long as it truly was the reason*.")(emphasis added).

2.

The Department's assertion that the Fire Chief was concerned with Wesley's "uneven" performance is similarly suspect. The Department initially asserted that negative items in Wesley's personnel file, arising in 1997 and 1999, were relevant to the Fire Chief's decision not to promote her to Captain.[8] Yet the Fire Chief himself testified that, while he knew of these issues, they did not influence his decision. This

---

[8] Apparently Wesley had some difficulty refreshing her skills after time on maternity leave in 1997, though subsequent reviews indicate no such problems. In 1999, she was involved in a minor vehicle accident.

16

inconsistency suggests that, in responding to Wesley's claims, the Department may not merely have been explaining the Fire Chief's decision-making process, but instead searching Wesley's file for any damaging piece of information that could conceivably have justified the Fire Chief's decisions. See E.E.O.C. v. Sears Roebuck and Co., 243 F.3d 846, 852-53 (2001)(inconsistent reasons and post-hoc rationalizations are "probative of pretext").

The Department's shifting explanations continued to the very close of the case before the district court. In its reply brief on summary judgment, the Department, for the first time, produced an affidavit from a training academy recruit alleging first-hand knowledge that Wesley slept at the academy when she was supposed to be supervising students – an accusation Wesley strongly denies. Yet this affidavit does not purport to show that the recruit ever relayed this information either to the Fire Chief or to anyone who attended the roundtables; thus, it cannot be known whether this information was relevant to the Fire Chief's state of mind at the time of his decisions. We also note again that the fire chief promoted one applicant to Captain despite a history that included an incident deemed a threat to patient life and which resulted in a forty-five day suspension. Clearly, performance and discipline issues were not always sufficient to deny promotion. We therefore conclude that a

17

reasonable jury could find the Department's proffer of these performance issues merely pretextual.[9]

IV.

For the foregoing reasons, we hold that Wesley has established a prima facie case of discrimination, and has shown that genuine issues of material fact exist as to whether the Department's proffered non-discriminatory reasons for its decision not to promote her are mere pretext for discrimination.

---

[9] The dissent urges that we not substitute this Court's judgment for that of the employer. However, we must similarly not invade the province of the jury and weigh the credibility of witnesses and evidence on contested issues of fact. We make no ultimate judgment on whether the reasons offered by the Department are pretextual. Instead, reviewing the limited and contradictory evidence in the record in the light most favorable to Wesley, we only hold that a reasonable jury could reach such a conclusion. Unlike this Court or the district court on summary judgment, a jury will be able to hear and see the testimony of witnesses, presumably including Wesley and Department officers. Additionally, the jury may lay the dueling evidence side by side and find some of it more credible and weighty. We are bound not to do so here. Although the dissent considers Wesley's case "regrettably weak," she has proffered substantial evidence (including the Department's own records, and affidavits from several senior officers) contradicting the recollections of the Fire Chief and others. Together, they are more than sufficient to support a jury finding of pretext.

Accordingly, we reverse the order of the district court granting summary judgment and remand the case for trial.[10]

REVERSED AND REMANDED

---

[10] Because we reverse the district court's order of summary judgment and remand for trial, we need not address that court's decision to deny Wesley's motion to strike certain affidavits that the Department attached to its reply brief on summary judgment.

WILKINSON, Circuit Judge, dissenting:

I thank my colleagues for their thoughtful opinion, but I must respectfully dissent. Because the record in this case provides no reasonable basis to infer that the Department's reasons for not promoting Wesley were false, much less that the actual reason was race or sex, her claims must fail. In remanding for trial, however, the majority unfortunately assumes the role of "super-personnel department weighing the prudence of employment decisions." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation omitted).

The Department produced three legitimate non-discriminatory reasons for not promoting Wesley: relative to the other candidates, she had less operations experience, less technical skill, and a less distinguished record of prior performance. To prevail, Wesley must be able to show not only that these reasons are false but also "that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

First of all, there is no dispute that Wesley had fewer total years in operations than the candidates who were promoted and that this factor was discussed at the roundtables. Operations experience refers to time spent serving on the crews of fire trucks or ambulances. The majority attempts to minimize this uncontroverted fact by noting that Wesley was said by one senior officer to have as much experience on fire trucks (as

20

opposed to ambulances) as some of the candidates who were promoted. But this testimony is neither here nor there. He did not dispute that the Department did, in fact, base its decision on Wesley's relative lack of total operations experience. Rather, he simply disputed whether, in his judgment, the Department should have based its decision on that fact. But "[w]e cannot require that different supervisors within the same organization must reach the same conclusion on an employee's qualifications and abilities." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005).

There is also no dispute that Wesley knew that her superiors wanted her to gain more experience in operations, that she chose to remain in non-operations positions despite their concerns, and that her choice was discussed at the roundtables. The majority attempts to discount these facts by stating that it was "entirely reasonable" for Wesley to remain in her non-operations job at the training academy. Maj. Op. at 14. But whether or not the decision seemed reasonable from Wesley's perspective is irrelevant. "[W]e have repeatedly explained that it is the perception of the decision maker which is relevant." DeJarnette, 133 F.3d at 299 (internal quotation and alteration omitted). And from the Chief's perspective, Wesley declined the opportunity to obtain the very experience that she knew was necessary to put herself among the top candidates for Captain.

21

The majority seeks to downplay the importance of operational experience by pointing out that "not every" captainship required such experience. Maj. Op. at 15. But it is not racial or sexual animus for a fire chief to want captains who are fully capable of assuming operational duties on fire trucks or ambulances, which, after all, is what the Department is about. The majority further attempts to discount Wesley's relative lack of operations experience by noting that she did eventually return to operations. But Wesley returned to operations for only sixteen months before choosing to transfer back to a non-operations position. During her return, she was involved in three vehicle accidents between April and June of 2002 and consequently received an unsatisfactory rating on a key element of her job performance. Moreover, the short duration of her return was discussed at the roundtables.

Turning to the Department's second reason, it is undisputed that the candidates promoted had at least one of the following certifications: advanced life support (ALS), hazardous materials, or technical rescue. Wesley, however, had none of these. The majority states that "participants of the roundtables dispute whether the Fire Chief ever discussed these certifications during these sessions." Maj. Op. at 15 (citing J.A. 228). To be sure, two roundtable participants did not recall whether "special consideration" was given to candidates

22

who were paramedics, i.e. those who held ALS certification. J.A. 228, 312-13. But those two participants did not deny that ALS or other certifications were discussed and thus given some consideration. Indeed, the whole point of the roundtables was to discuss such matters. At most, there is a question about how much weight was given to a particular certification, but there is no question that Wesley lacked that certification.

The majority's real concern seems to be that the Chief did not give enough weight to Wesley's other qualifications. In its view, the Chief valued other candidates' "marginally relevant" qualifications but disregarded Wesley's "seemingly pertinent" ones. Maj. Op. at 16. I do not understand how the majority distinguishes between the "marginal[]" and the "pertinent." Among the "marginal[]," it places one candidate's leadership role in an inter-jurisdictional task force, which according to the Chief, "required [the candidate] to manage complex personnel and technical situations." J.A. 30. But among the "pertinent," it places Wesley's experience in public relations. More generally, as the majority rightly acknowledges, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason." DeJarnette, 133 F.3d at 299 (internal quotation omitted). The mere fact that the majority would weigh certain undisputedly relevant qualifications differently is hardly a reason to infer

23

that the Department is prevaricating -- much less discriminating on the basis race or sex.

Turning to the Department's third reason, it is undisputed that Wesley had a relatively spotty performance record, that the Chief was aware of her record, and that her record was discussed at the roundtables. The majority, however, faults the Department for offering "shifting explanations." Maj. Op. at 17. To establish this, it compares the Department's interrogatory responses to the Chief's deposition. In its interrogatory responses, the Department listed several instances of unsatisfactory performance from Wesley's personnel records. These included a 1997 incident in which Wesley performed poorly as a pump operator and then showed little initiative to improve and a 1999 incident in which she was involved in a vehicle accident while responding to a call. To be sure, the Chief later stated that, while he was aware of these two particular incidents, he probably deemed them too stale for his consideration. But his statement is not a reason to infer that the Department has been offering shifting explanations. The Department never claimed that Wesley was not promoted because of one or two particular incidents. Rather, it consistently maintained that she was not promoted because of her general reputation for poor performance -- most recently reinforced by her involvement in three vehicle accidents in 2002. Indeed, the

24

interrogatory response in question does not purport to say that the 1997 and 1999 incidents were major factors in the Chief's decision; instead, it points to them only as part of a "persistent pattern of concerns" about Wesley's performance. J.A. 99. If there is any inconsistency at all between the interrogatory responses and the Chief's statement, it is negligible. It goes only to which of the various instances of poor performance in Wesley's past stood out the most to the Chief -- not to whether he was aware of the instances at the time of his decision or whether he ever wavered in his overall assessment that her performance was poor.

In its continuing effort to portray the Department's explanations as "shifting," the majority also points out that the Department submitted an affidavit late in the litigation from a training recruit who stated that Wesley fell asleep during classes she was supposed to be teaching and lacked knowledge of basic concepts. It is hard to see how this affidavit is evidence of an inconsistent explanation, given that the Fire Chief and several battalion chiefs had previously stated in their affidavits that such concerns were raised at the roundtables. To be sure, two panel participants did not recall these concerns being discussed. But to label the Department's position as shifting because of the recruit's affidavit, as the majority does, is simply incorrect.

The majority attempts to bolster its argument that the Department did not actually base its decision on Wesley's spotty performance record by pointing out that the Fire Chief promoted someone to Captain in 2002 despite an even spottier record. It is telling that the majority must reach outside of the limitations period for Wesley's suit to find someone who was promoted with a record that was arguably worse than hers.[*] It does not point to a single blemish in the personnel files of the six individuals promoted during the period of her suit, despite the fact that those files are in the record. See J.A. 400-768. Nor does it contend that Wesley matched up against those who actually received the promotion. What is more, the majority fails to note that the position of Fire Chief was held by a different individual in 2002 than in the period covered by Wesley's suit. That the new chief may have taken past performance more seriously than his predecessor is no reason to infer that he discriminated against Wesley.

The majority suggests that it is merely respecting the "province of the jury" by declining "to weigh the credibility of witnesses and evidence on contested issues of fact." Maj. Op. at

---

[*] Under the statute of limitations, Wesley's suit covers only the period from October 2004 to August 2005, during which the Department promoted six individuals. Wesley v. Arlington County, 2008 WL 4774480, at *4 (E.D. Va. Oct. 24, 2008).

26

18, n.9. But this argument misses the point. The only thing in dispute here is whether the Chief's decision was wise or not -- a point which can be debated with respect to every single decision to promote but which is not a material issue under Title VII. The majority does little more than second-guess the Fire Chief's decision, but it is not our role nor within our competence to do so. This is especially true where, as here, the position involved is critical to public safety and demands a very specialized skill set. The Captain of a fire truck must not only possess technical capabilities and extensive experience but also command the respect of his or her team. Otherwise, the morale and efficiency of that team may crumble, resulting in serious injury to both persons and property.

I recognize that historically the officer ranks of fire and police departments have not been as open to minority and female officers as they should have been. And yet, as the district court noted and the majority does not contest, the Department has in recent years promoted well-qualified African-Americans and women to various positions at rates comparable to the rates for white males. See Wesley v. Arlington County, 2008 WL 4774480, at *3 (E.D. Va. Oct. 24, 2008). This case is, however, regrettably weak. The promotion in question should be earned at the stationhouse -- not the courthouse. With full respect for

27

my able colleagues, I would affirm the judgment of the district court.